Corwin v. British Am. Tobacco p.l.c., 2015 NCBC 74.

STATE OF NORTH CAROLINA

COUNTY OF GUILFORD

DR. ROBERT CORWIN AS TRUSTEE
FOR THE BEATRICE CORWIN
LIVING IRREVOCABLE TRUST, on
Behalf of a Class of Those Similarly
Situated,

    Plaintiff,

  v.

BRITISH AMERICAN TOBACCO
PLC; REYNOLDS AMERICAN, INC.;
SUSAN M. CAMERON; JOHN P.
DALY; NEIL R. WITHINGTON;
LUC JOBIN; SIR NICHOLAS
SCHEELE; MARTIN D. FEINSTEIN;
RONALD S. ROLFE; RICHARD E.
THORNBURGH; HOLLY K.
KOEPPEL; NANA MENSAH;
LIONEL L. NOWELL III; JOHN J.
ZILLMER; and THOMAS C.
WAJNERT,

    Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
14 CVS 8130

**ORDER & OPINION**

{1} THIS MATTER is before the Court on Defendant British American Tobacco p.l.c.'s Motion to Dismiss Plaintiff's First Amended Class Action Complaint ("BAT's Motion to Dismiss"), and The Director Defendants' and Reynolds American Inc.'s Motion to Dismiss Plaintiff's First Amended Class Action Complaint ("RAI and Director Defendants' Motion to Dismiss") (collectively, the "Motions"), brought pursuant to Rule 12(b)(1) and Rule 12(b)(6) of the North Carolina Rules of Civil Procedure ("Rule(s)"). For the reasons expressed below, the Motions are GRANTED.

*Van Laningham Duncan, PLLC by Alan W. Duncan and Stephen M. Russell Jr., and Block & Leviton LLP by Jason M. Leviton (pro hac vice) and Joel A. Fleming (pro hac vice) for Plaintiff Dr. Robert Corwin as Trustee for the Beatrice Corwin Living Irrevocable Trust.*

*Robinson & Lawing LLP by Michael L. Robinson and H. Brent Helms, and Cravath, Swaine & Moore LLP by Gary A. Bornstein (pro hac vice) for Defendant British American Tobacco p.l.c.*

*Womble Carlyle Sandridge & Rice, LLP by Ronald R. Davis, W. Andrew Copenhaver, and James A. Dean, and Jones Day by Robert C. Micheletto (pro hac vice), Thomas E. Lynch (pro hac vice), and Andrew S. Kleinfeld (pro hac vice) for Defendants Reynolds American, Inc., Susan M. Cameron, John P. Daly, Neil R. Withington, Sir Nicholas Scheele, Martin D. Feinstein, and Ronald S. Rolfe.*

*Moore & Van Allen PLLC by James P. McLoughlin, Jr., Mark A. Nebrig, Frank E. Schall, and Jonathan M. Watkins for Defendants Luc Jobin, Holly K. Koeppel, Nana Mensah, Lionel L. Nowell, III, John J. Zillmer, and Thomas C. Wajnert.*

Gale, Chief Judge.

## I.    INTRODUCTION

{2}    This action concerns a transaction ("Transaction") between Reynolds American, Inc. ("RAI"), Lorillard, Inc., ("Lorillard"), and Imperial Tobacco Group, p.l.c. ("Imperial"), funded in part by a share purchase by RAI's largest shareholder, British American Tobacco, p.l.c. ("BAT").  Dr. Robert Corwin ("Corwin") seeks to represent a class of RAI common shareholders other than BAT.  Corwin's First Amended Class Action Complaint ("Amended Complaint") asserts three causes of action: (1) breach of fiduciary duty against RAI's directors; (2) breach of fiduciary duty against BAT as a controlling shareholder; and (3) aiding and abetting breach of fiduciary duty against RAI for the alleged breach of fiduciary duty by RAI's directors.

{3}    The claim against the various directors alleges, in part, that they breached their duty of candor by failing to make certain disclosures prior to a shareholder vote ("Disclosure Claims") and requested that the Transaction be

enjoined pending further necessary disclosures. The Disclosure Claims were resolved by a settlement, pursuant to which RAI made additional disclosures and Corwin agreed not to seek to enjoin the shareholder vote or to set aside the Transaction should it be approved and closed. The settlement did not resolve other claims related to the Transaction's pricing of shares that BAT purchased ("Fairness Claims"), which Corwin attacks as inadequate either because RAI's directors were improperly influenced by BAT's control or because they otherwise failed to properly discharge their fiduciary duties when approving the Transaction.

{4} Having concluded that the Amended Complaint does not state an underlying breach of fiduciary duty claim against BAT or RAI's directors, the Court need not address the aiding and abetting a breach of fiduciary duty claim. In reaching its conclusion, the Court has assumed without deciding that Corwin has standing to bring his claims directly, rather than derivatively.

## II.    THE PARTIES

{5} Plaintiff Corwin is Trustee for the Beatrice Corwin Living Irrevocable Trust (the "Trust"), a New York trust. The Trust has held RAI common stock since January 1, 2011.

{6} Defendants Susan M. Cameron ("Cameron"), John P. Daly ("Daly"), Neil R. Withington ("Withington"), Luc Jobin ("Jobin"), Sir Nicholas Scheele ("Scheele"), Martin D. Feinstein ("Feinstein"), Ronald S. Rolfe ("Rolfe"), Richard E. Thornburgh ("Thornburgh"), Holly K. Koeppel ("Koeppel"), Nana Mensah ("Mensah"), Lionel L. Nowell, III ("Nowell"), John J. Zillmer ("Zillmer"), and Thomas C. Wajnert ("Wajnert") (collectively "Director Defendants") are, or were at the relevant times, directors of RAI. Susan M. Cameron has also been President and CEO of RAI since May 1, 2014.

{7} Defendants Daly, Withington, Scheele, Feinstein, and Rolfe (collectively, "BAT Designees") were nominated to the RAI Board of Directors by BAT.

{8}     Defendants Jobin, Thornburgh, Koeppel, Mensah, Nowell, Zillmer, and Wajnert (collectively, "Other Directors") were not employed by RAI and were not nominated to the board by BAT.

{9}     Defendant BAT is a tobacco holding company headquartered in London, England.  BAT owned a forty-two percent stake in RAI before the Transaction and maintained its percentage ownership in RAI after the Transaction's close.[1]

{10}     Defendant RAI is a holding company incorporated in North Carolina and headquartered in Winston-Salem, North Carolina.  RAI is the second-largest tobacco company in the United States.

{11}     Prior to the Transaction's close, Nonparty Lorillard was a tobacco holding company incorporated in Delaware and headquartered in Greensboro, North Carolina and was the third-largest tobacco company in the United States.

{12}     Nonparty Imperial is a tobacco holding company headquartered in Bristol, England.

### III.     PROCEDURAL HISTORY

{13}     Corwin filed his original Class Action Complaint on August 8, 2014. The case was designated a mandatory complex business case by North Carolina Supreme Court Chief Justice Sarah Parker on August 11, 2014, and assigned to the undersigned on August 12, 2014.

{14}     Corwin filed his Amended Complaint on November 7, 2014, supplementing the breach of fiduciary duty claim against the Director Defendants with allegations of a breach of their duty of candor for failure to make material disclosures, and integrating information from RAI's Form S-4 Registration Statement, which was filed with the SEC on October 17, 2014.

---

[1] The Court has been advised that the Transaction was approved by shareholder votes, approved by the FTC, and closed.  The Court has limited its consideration of the Amended Complaint's adequacy to state the claims asserted, without consideration of events occurring after the Amended Complaint was filed.  However, those additional events would raise other questions the Court need not consider as to whether those events effectively ratified the Transaction or otherwise mooted the claims.

{15}   On December 5, 2014, BAT filed a motion seeking to stay discovery until the Court's ruling on BAT's motion to dismiss.  On December 8, 2014, Defendants filed several motions, including: (1) BAT's Motion to Dismiss; (2) RAI and Director Defendants' Motion to Dismiss; and (3) Defendants Reynolds American Inc., Cameron, Daly, Feinstein, Rolfe, Withington, Scheele, Jobin, Thornburgh, Koeppel, Mensah, Nowell, Zillmer, and Wajnert's Motion to Stay Discovery (with BAT's motion to stay, the "Motions to Stay").

{16}   On December 12, 2014, RAI filed an amended Form S-4 with the SEC, announcing a shareholder vote on an issuance of shares in connection with the Transaction.[2]

{17}   On December 23, 2014, Corwin stated his intention to file a motion to enjoin the shareholder vote.  The Court held a telephone conference on December 30, 2014, to establish an appropriate briefing and hearing schedule.  On January 2, 2015, Corwin filed Plaintiff's Motion for Preliminary Injunction to Enjoin Shareholder Meeting and Vote ("Preliminary Injunction Motion"), which the Court set for a hearing to occur on January 16, 2015, with expedited briefing in advance.

{18}   On January 8, 2015, the Court ruled on the Motions to Stay, providing that only RAI must produce certain limited discovery on an expedited basis before the January 16, 2015, hearing.  The Court issued a Stipulated Confidentiality Agreement and Protective Order on January 11, 2015.  On January 14, 2015, RAI produced the required discovery or supplied affidavits as to its nonexistence.

{19}   On January 15, 2015, the parties advised the Court that they had reached a preliminary agreement regarding the Disclosure Claims.  As the final documentation had not yet been executed and filed, the Court convened the January 16, 2015, hearing, announced the apparent settlement, and deferred any further consideration of the request to enjoin the upcoming shareholder vote.  The parties

---

[2] This was the second amended proxy statement.  The first amended proxy statement was filed with the SEC on November 24, 2014.  As the parties almost exclusively reference the original preliminary proxy regarding the claims remaining before the Court, the Court has relied almost entirely on the original preliminary proxy statement in this Order & Opinion.  The Court is aware of no additional statement in subsequent SEC filings that would affect its ruling.

filed their Memorandum of Understanding regarding the Disclosure Claims on January 17, 2015. The Court has held in abeyance further proceedings required for it to approve the class settlement pending the Court's consideration of the present Motions related to the Fairness Claims.

{20} RAI filed a supplemental Form 8-K with the SEC on January 20, 2015, as provided by the settlement. The RAI shareholder meeting to consider the Transaction then proceeded, with shareholders voting to approve the Transaction.

{21} Thereafter, the Court held oral argument on the Motions, which have been fully briefed and are ripe for disposition.

## IV.    FACTUAL BACKGROUND

{22} The following facts, stated solely for purpose of providing context for the Court's ruling on the Motions, are taken from the Amended Complaint and the documents that it incorporates or to which it refers, unless otherwise expressly noted. As the Motions are grounded both on Rules 12(b)(1) and 12(b)(6), the Court is permitted to consider matters outside the pleadings, but it has not been required to do so, as it has assumed Corwin's standing and considered his claims on their merits. *See Carlisle v. Keith*, 169 N.C. App. 674, 688–89, 614 S.E.2d 542, 551–52 (2005) (reiterating the trial court's ability to consider matters outside the pleadings without converting a Rule 12(b)(6) motion to dismiss into a motion for summary judgment if those matters are incorporated by reference in a complaint). The Court has assumed the factual allegations of the Amended Complaint to be true, without being bound to the legal conclusions Corwin asserts based on those alleged facts. *Walker v. Sloan*, 137 N.C. App. 387, 392, 529 S.E.2d 236, 241 (2000).[3]

{23} RAI was created in 2004 as a result of a transaction in which R.J. Reynolds Tobacco Company acquired BAT's United States subsidiary, Brown & Williamson Tobacco Corporation. BAT obtained a forty-two percent stake in the newly formed RAI.

---

[3] The SEC filings include substantially more details regarding the Transaction than the Court includes in its summary or than are necessary to its ruling.

{24}     At that time, RAI and BAT entered into a Governance Agreement that provides for a standstill period of ten years, during which BAT agreed (with certain exceptions) to purchase no more shares of RAI.  Although the standstill period expired on July 30, 2014, the Governance Agreement includes other terms that continue beyond the standstill period that both grant and restrict certain of BAT's rights.  Significantly, the restrictions preclude BAT from exercising its voting power to control the election of a majority of the RAI Board.  The Governance Agreement includes the following terms:

- BAT has the right to designate for nomination five directors of RAI's thirteen-member Board of Directors, with the number of directors reducing incrementally if BAT's ownership falls below forty-two percent. Three of the BAT Designees must be independent as defined by the rules established by the New York Stock Exchange.

- BAT must vote all of its shares in favor of any board candidates selected by the Corporate Governance and Nominating Committee, which must consist solely of non-BAT Designees.

- A majority of the BAT Designees must approve of any transaction in which RAI issues equity securities in an amount that comprises five percent or more of the voting power outstanding as calculated before the issuance of the stock, and of certain share repurchase transactions.

- BAT must approve certain sales of intellectual property, amendments to the Articles of Incorporation or the By-Laws, or the adoption of any takeover defenses.

- A majority of the Other Directors must approve RAI's entrance into any contract involving RAI and its subsidiaries and BAT and its subsidiaries.

The Governance Agreement provides that it terminates automatically if BAT gains control of 100 percent of RAI's voting stock.

{25}     As noted in the discussion below, the terms restricting BAT's input into the selection of the RAI Board remained in effect during the Board's consideration of the Transaction and were not terminated by the terms of the Transaction.

{26}     In early November 2012, Daniel M. Delen ("Delen"), then RAI's CEO and president, and Wajnert, the Chairman of the RAI Board of Directors, met with

BAT to discuss a possible combination of RAI and Lorillard. BAT expressed its support. Later, on November 15, 2012, Delen discussed the possibility of such a business combination with Murray S. Kessler ("Kessler"), Lorillard's Chairman, President, and CEO. Kessler agreed to discuss the concept with his Board but emphasized that any transaction must deliver value to Lorillard's shareholders.

{27} Beginning in January 2013, BAT and RAI began discussing a possible combination between RAI and Lorillard. BAT indicated that it would be willing to finance part of the Transaction in order to maintain its forty-two percent ownership. BAT stated that it would cooperate with this possible business combination only if it approved of the transactional terms and execution strategy, including the brands RAI may be required to divest, the subscription price for any additional investment by BAT, alterations to the Governance Agreement, and any commitment by RAI to pay any termination fee resulting from the Transaction's possible failure to obtain regulatory clearance.

{28} On March 8, 2013, the RAI Board discussed the need to identify a buyer for various RAI and Lorillard brands that may need to be sold in order to ensure FTC antitrust clearance and identified Imperial as a potential buyer. Imperial subsequently expressed interest in purchasing certain RAI brands.

{29} On or before June 4, 2013, RAI's Other Directors approved a nonbinding term sheet that included terms allowing BAT to maintain its forty-two percent beneficial ownership. RAI and BAT then executed this nonbinding term sheet. At BAT's insistence, the nonbinding term sheet included a provision that neither BAT nor RAI would seek any changes in the Governance Agreement in connection with the Transaction.

{30} Later, during the summer of 2013, BAT communicated to RAI that it would not support a transaction that would require RAI to divest its blu eCigs brand.

{31} At the beginning of 2014, RAI and Lorillard undertook further research regarding the possibility of a deal between the two companies. On January 18, 2014, the Other Directors, the Strategic Matters Review Committee

("SMRC"),[4] and the RAI Board of Directors held a telephone conference with RAI's senior management and RAI's advisors. This was the first indication of any separate action, other than the June 2013 vote on the nonbinding term sheet, by the Other Directors in relation to the Transaction. The Other Directors did not discuss engaging independent counsel with relation to the Transaction until early February 2014, after which Moore & Van Allen PLLC, a North Carolina law firm, was retained as counsel for the Other Directors. It does not appear that the Other Directors ever retained a separate, independent financial advisor.

{32} Media activity intensified during spring 2014. The first public report speculating as to RAI's purchase of Lorillard was made on February 28, 2014. In March 2014, media outlets reported that BAT planned to purchase the remaining fifty-eight percent of RAI upon expiration of the standstill period. On April 29, 2014, CNBC issued a report speculating that the tobacco industry was soon to consolidate and that RAI may soon acquire Lorillard.

{33} On April 30, 2014, Delen resigned and Cameron was elected as RAI's CEO, effective May 1, 2014.

{34} On May 7, 2014, the Other Directors met with RAI management and RAI's legal and financial advisors to consider the purchase of Lorillard. At that meeting, the various parties discussed the unlikelihood of obtaining any other equity financing on terms as favorable as those BAT offered. The Other Directors approved pursuing an acquisition of Lorillard at 65 dollars per share, representing a 32.5 percent premium over Lorillard's closing share price on February 28, 2014.

{35} Scott M. Hayes ("Hayes"), BAT's head of mergers and acquisitions, was involved in negotiations with the RAI Board and management. Hayes made a presentation proposing a transaction and indicating BAT's support for such a transaction. BAT withdrew its opposition to divesting RAI's blu eCigs brand after the proposed purchase price for other RAI brands was increased.

---

[4] The SMRC operated on RAI's behalf from September 2012 until May 2014. The record does not disclose its membership.

{36} On July 3, 2014, CNBC reported that RAI's purchase of Lorillard may be announced by the end of July 2014 at an offer price of 68 dollars per share of Lorillard common stock.

{37} During a meeting between RAI, Lazard (one of RAI's financial advisors), Lorillard, and Centerview Partners LLC (one of Lorillard's financial advisors), on July 5, 2014, Lorillard insisted that BAT commit to vote its common stock in favor of the Transaction even if the RAI Board no longer recommended the Transaction. BAT indicated that it would not give such a commitment if the Other Directors objected to the Transaction.

{38} On July 11, 2014, Imperial issued a press release that confirmed its discussions with RAI and Lorillard. RAI and Lorillard also issued press releases acknowledging that they were in discussions regarding RAI's possible purchase of Lorillard. BAT issued its own press release, noting that it expected to assist in the Transaction by purchasing additional shares in order to maintain its forty-two percent ownership.

{39} On July 13 and 14, 2014, the RAI Board of Directors met with RAI's senior management and Lazard, Jones Day (counsel for the BAT Designees), and other advisors. Lazard rendered its fairness opinion, indicating that the agreement was fair to RAI and RAI shareholders other than BAT. The RAI Board of Directors unanimously approved the Transaction. Also on July 13 and 14, 2014, the Other Directors met with RAI's senior management and representatives of Lazard, Jones Day, Moore & Van Allen PLLC, and other advisors to consider the Transaction in detail. The Other Directors subsequently and unanimously approved the Transaction.

{40} On July 14, 2014, Lorillard met with their financial advisors, who rendered their fairness opinion, indicating that the agreement was fair to Lorillard common-stock holders. The Lorillard Board of Directors then unanimously voted to approve the merger agreement and related transactions.

{41} On July 15, 2014, RAI and Lorillard executed the merger agreement, and RAI, BAT, Imperial, and Lorillard executed the other related agreements.

Later that day, RAI issued a press release formally announcing the Transaction and detailing its terms:

- RAI would acquire Lorillard for cash and stock at the current value of $68.88 per Lorillard share, for a net price of $27.4 billion.

- Lorillard shareholders would receive $50.50 in cash and 0.2909 of an RAI share for each Lorillard share they held.

- Imperial would purchase the KOOL, Salem, Winston, Maverick, and blu eCigs brands from RAI for a total of $7.1 billion, amounting to $4.4 billion paid to RAI after taxes.

- Imperial would acquire certain Lorillard assets, including its Greensboro, North Carolina manufacturing and research and development facilities.

- BAT would maintain its 42 percent ownership in RAI by investing approximately $4.7 billion in an additional share purchase based on a price of $60.16, the closing price as of July 2, 2014, which was the same price used to determine the stock component of Lorillard shareholders' consideration.[5]

- RAI and BAT "agreed in principle to pursue an ongoing technology-sharing initiative for the development and commercialization of next-generation tobacco products." (Director Defs.' & Reynolds American, Inc.'s Mot. Dismiss Pl.'s First Amend. Class Action Compl. Ex. C, at 2.)

- Lazard would be lead financial advisor to RAI on the Transaction.

{42} The RAI share price on the day the Transaction was announced was $63.18.

{43} As noted, the Court is advised that an overwhelming majority of RAI and Lorillard common shareholders approved the Transaction on January 28, 2015, and the Transaction closed on or about June 12, 2015, after receiving FTC approval.

---

[5] Corwin challenges whether this was, in fact, the price used to determine consideration paid to Lorillard shareholders. The Court does not believe any such factual dispute is material to the remaining claims subject to the Motions.

## V.    ANALYSIS

### A.  Standard of Review

{44}    The claims involve RAI's internal affairs, and RAI is incorporated in North Carolina.  North Carolina law then governs this Transaction, and the parties do not argue otherwise.  *See Bluebird Corp. v. Aubin*, 188 N.C. App. 671, 680, 657 S.E.2d 55, 63 (2008) (citing *Edgar v. MITE Corp.*, 457 U.S. 624, 645 (1982)). Although Corwin has urged the Court to consider certain Delaware precedent as persuasive on issues for which he contends there is no clear North Carolina precedent, the Court resolves the claims as a matter of North Carolina law.

{45}    The Motions are made pursuant to both Rule 12(b)(1), based on the assertion that there is no subject matter jurisdiction because Corwin lacks standing, and Rule 12(b)(6), based on the assertion that the Amended Complaint fails to state a claim upon which relief may be granted.  "Rule 12(b)(1) . . . allows for the dismissal of a complaint due to a lack of jurisdiction over the subject matter of the claim or claims asserted in that complaint."  *State ex rel. Cooper v. Seneca-Cayuga Tobacco Co.*, 197 N.C. App. 176, 181, 676 S.E.2d 579, 583 (2009).  Standing is properly challenged under Rule 12(b)(1).  *Fuller v. Easley*, 145 N.C. App. 391, 395, 553 S.E.2d 43, 46 (2001).  A court's inquiry on a Rule 12(b)(1) motion is not limited to the allegations in the complaint.  *See Harris v. Matthews*, 361 N.C. 265, 271, 643 S.E.2d 566, 570 (2007) (noting that, in ruling on a 12(b)(1) motion to dismiss, a court may consider matters outside the pleadings).[6]  On a motion to dismiss under Rule 12(b)(6), the Court evaluates "whether, as a matter of law, the allegations of the complaint, treated as true, are sufficient to state a claim upon which relief may be granted under some legal theory, whether properly labeled or not."  *Crouse v. Mineo*, 189 N.C. App. 232, 237, 658 S.E.2d 33, 36 (2008) (quoting *Harris v. NCNB Nat'l Bank of N.C.*, 85 N.C. App. 669, 670, 355 S.E.2d 838, 840 (1987)).

---

[6] This principle would allow the Court to consider the impact of the shareholder vote, if necessary, to resolve Corwin's standing to assert his claims directly.  This has not been necessary because the Court has resolved the Motions without having to consider the events occurring after the Amended Complaint was filed.

## B. Issues Presented

{46}     The dominant issue the Court must resolve is whether BAT controlled RAI with relation to the Transaction even though it owned only a minority share of RAI.  As discussed in detail below, North Carolina courts have recognized that a controlling majority shareholder, at least in closely held corporations, owes a fiduciary duty to minority shareholders, who can bring a direct rather than a derivative claim for a breach of that duty.  North Carolina courts have never squarely addressed whether a minority shareholder can exercise control adequate to impose such a fiduciary duty.  Defendants contend that a correct reading of North Carolina precedent is that the imposition of any fiduciary duty on a shareholder favors a straightforward numerical test of majority ownership.  Corwin contends that North Carolina precedent is more flexible and turns on the fact of a shareholder's dominance and control, which can exist without majority ownership or voting control.  He suggests Delaware precedent that embodies this more flexible approach is persuasive and should be followed by North Carolina courts.  Even the Delaware precedent, if followed, would require allegations of actual, rather than potential, control over the Transaction that is subject to court scrutiny.

{47}     Corwin's briefing suggests that his claim against the Director Defendants for their breach of fiduciary duty depends upon a finding that BAT is a controlling shareholder.  However, because Corwin complains of the fairness and adequacy of the consideration RAI received in exchange for the shares BAT purchased to maintain its forty-two percent interest in RAI, the Court has further examined whether the Amended Complaint states a claim for breach of duty by the RAI Directors in approving the Transaction.  Corwin suggests that the overall Transaction should be subject to an entire fairness review, upon which the Director Defendants must assume the burden of proof.  Defendants vigorously argue that the Court need not reach that issue, because any such potential claim can be brought only as a derivative action, whereas Corwin admits that he has not satisfied the prerequisites of a derivative action and brings only direct claims.  In addressing the

asserted claim against the Director Defendants on its merits, the Court elects to assume without deciding that Corwin has standing to bring the claim.

{48}   The Court concludes that the Amended Complaint does not state a claim for breach of fiduciary duty by either BAT or the Director Defendants.  This renders it unnecessary for the Court to consider further the uncertain claim of aiding and abetting breach of fiduciary duty.

## C. The Amended Complaint Does Not Allege Sufficient Facts to Impose a Fiduciary Duty upon BAT as a Controlling Shareholder

{49}   "As a general rule, shareholders do not owe a fiduciary duty to each other or to the corporation." *Freese v. Smith*, 110 N.C. App. 28, 37, 428 S.E.2d 841, 847 (1993).  North Carolina courts recognize an exception to this general rule, so that a controlling majority shareholder may owe a fiduciary duty to minority shareholders. *Id.*  BAT argues that "North Carolina courts have never accepted the argument that indicia of influence could push a minority shareholder over the line to become a controller subject to fiduciary duties."  (Mem. Law Supp. Def. BAT's Mot. Dismiss Pl's First Am. Class Action Compl. ("Mem. Supp.") 11.)  BAT further argues that, as a policy matter, a bright-line test based on majority ownership will assure certainty and predictability and avoid a glut of cases requiring a fact-specific inquiry into various indicia of control.  If the Court were to adopt such a bright line test, Corwin's claim would fail as there is no allegation, nor can there be, that BAT has ever owned or held voting control over a numerical majority of the outstanding shares.

{50}   While acknowledging that no prior North Carolina opinion has squarely held a minority-percentage owner to be a controlling shareholder, Corwin urges that the principles underlying the North Carolina courts' imposition of a fiduciary duty on the shareholder are dominance and control, and that there are circumstances where a minority owner can exercise such dominance and control. He suggests that this Court, consistent with North Carolina precedent, should follow a more flexible test to measure domination and control, as Delaware courts

have done when finding, on particular facts, that control can be exercised with an ownership level significantly below fifty percent. *See, e.g.*, *Robbins & Co. v. A. C. Isr. Enters.*, 1985 Del. Ch. LEXIS 498, at *13–14 (Oct. 2, 1985) ("This Court and others have recognized that substantial minority interests ranging from 20% to 40% often provide the holder with working control.") (citing *Essex Universal Corp. v. Yates*, 305 F.2d 572, 579 (2nd Cir. 1962); *Gottesman v. Gen. Motors Corp.*, 279 F. Supp. 361, 368 (S.D.N.Y. 1967); *Moran v. Household Int'l, Inc.*, 490 A.2d 1059 (Del. Ch. 1985); *Cheff v. Mathes*, 199 A.2d 548, 555 (Del. 1964)).

{51}     The Court has carefully reviewed both the line of North Carolina cases that have recognized a fiduciary duty owed by a controlling shareholder and the Delaware decisions that Corwin contends are persuasive. Having done so, the Court has found no direct North Carolina holding that a controlling shareholder must be a majority owner, although in each case that imposes a fiduciary duty on a shareholder, the shareholder subject to that duty either owned or had control over a majority interest. *See, e.g.*, *Hill v. Erwin Mills, Inc.*, 239 N.C. 437, 443, 80 S.E.2d 358, 362 (1954) (recognizing that a holder of the majority of outstanding stock owes a heightened duty to a minority owner); *Freese*, 110 N.C. App. at 38, 428 S.E.2d at 848 (finding a fifty-five percent owner to be a majority shareholder and therefore owing a fiduciary duty to plaintiff, who was a forty-five percent shareholder); *Loy v. Lorm Corp.*, 52 N.C. App. 428, 431–33, 278 S.E.2d 897, 901 (1981) (referring to three shareholders jointly as "the majority shareholders," and finding that they jointly owed a fourth, twenty-five percent shareholder a fiduciary duty); *Thomas v. McMahon*, 2015 NCBC LEXIS 67, at *27–29 (N.C. Super. Ct. June 23, 2015) (finding that an eighty percent shareholder in a close corporation owed a fiduciary duty to minority shareholders by virtue of its majority interest). In at least one decision, the North Carolina Court of Appeals declined to impose a fiduciary duty on a minority owner without even considering the potential impact of other indicia of control. *Kaplan v. O.K. Techs., LLC*, 196 N.C. App. 469, 473, 675 S.E.2d 133, 137 (2009) (noting that a 41.5 percent shareholder, solely because it owned less than the

majority of the outstanding shares, did not owe a fiduciary duty to minority shareholders).

{52}    The policy reasons underlying the imposition of a fiduciary duty on at least a majority shareholder in North Carolina were well articulated by the North Carolina Supreme Court in *Gaines v. Long Manufacturing Co.*:

> The holders of the majority of the stock of a corporation have the power, by the election of directors and by the vote of their stock, to do everything that the corporation can do. Their power to . . . direct the action of the corporation places them in its shoes and constitutes them the actual, if not the technical, trustees for the holders of the minority of the stock. They draw to themselves and use all the powers of the corporation. . . .
>
> The devolution of unlimited power imposes on holders of the majority of the stock a correlative duty, the duty of a fiduciary or agent, to the holders of the minority of the stock, who can act only through them— the duty to exercise good faith, care, and diligence to make the property of the corporation produce the largest possible amount, to protect the interests of the holders of the minority of the stock, and to secure and pay over to them their just proportion of the income and of the proceeds of the corporate property. The controlling majority of the stockholders of a corporation, while not trustees in a technical sense, have a real duty to protect the interests of the minority in the management of the corporation, especially where they undertake to run the corporation without giving the minority a voice therein. This is so because the holders of a majority of the stock have a community of interest with the minority holders in the same property and because the latter can act and contract in relation to the corporate property only through the former. It is the fact of control of the common property held and exercised, and not the particular means by which or manner in which the control is exercised, that creates the fiduciary obligation on the part of the majority stockholders in a corporation for the minority holders.

234 N.C. 340, 344–45, 67 S.E.2d 350, 353 (1951) (omissions in original) (quoting 13 Am. Jur. *Corporations* §§ 422, 423 (1938)).

{53}    After its comprehensive review of these various cases, the Court concludes that the language in the North Carolina decisions leaves open the specific question of whether a minority shareholder can exercise the degree of control discussed in *Gaines*, adequate to impose a fiduciary duty on that shareholder. *See,*

*e.g.*, *Erwin Mills*, 239 N.C. at 444, 80 S.E.2d at 363 ("It is the general rule that when the fairness of transactions between a corporation and one dominating its policies is challenged, the burden is upon those who would maintain such transactions to show their inherent fairness to all parties concerned."); *T-WOL Acquisition Co. v. ECDG S., LLC*, 220 N.C. App. 189, 208 n.8, 725 S.E.2d 607, 617 (2012) ("[C]ontrolling *or* majority shareholders owe a fiduciary duty to minority shareholders in a closely held corporation." (emphasis added)); *Freese*, 110 N.C. App. at 37, 428 S.E.2d at 847 ("In North Carolina, it is well established that a controlling shareholder owes a fiduciary duty to minority shareholders."); *Gusinsky v. Flanders Corp.*, 2013 NCBC LEXIS 43, at *16 (N.C. Super. Ct. Sept. 25, 2013) (using the disjunctive "or" to note that a court may find a controlling *or* majority shareholder to impose a duty, but then only predicating analysis on a shareholder's majority status); *Emergys Corp. v. Consert, Inc.*, 2012 NCBC LEXIS 19, at *21 (N.C. Super. Ct. Apr. 5, 2012) (noting, in a non-shareholder suit, that "[i]t is well established under North Carolina law that the element of control is what gives rise to a fiduciary duty between the controlling shareholder and the minority"); *cf. Fulton v. Talbert*, 255 N.C. 183, 185, 120 S.E.2d 410, 412 (1961) ("[W]here the corporation is so dominated and controlled by a wrongdoer as to be powerless to act, minority stockholders may bring the action, making the corporation a party.").

{54} The Court acknowledges the potential benefit of certainty and predictability that the bright-line rule of majority ownership might afford. However, it also recognizes the potential abuse of a rigid rule and its potential for far-reaching consequences. Such a rule would be better adopted by the legislature or our appellate courts. The Court concludes that it should confine its analysis to the facts of this particular case, and in doing so, it has considered whether the Amended Complaint would survive under either of the tests the parties urge. The Court concludes that it does not.

{55} The Court has given Corwin the full benefit of the consideration of the Delaware cases he offers as persuasive support for his position. Those cases, however, demand adequate demonstration of actual, not potential, control of the

transaction at issue, and where the transaction is controlled by the corporation's board, there must be actual domination and control over the board in connection with the transaction. The Amended Complaint does not satisfy this pleading standard. It contains detailed allegations that demonstrate that BAT may have had significant influence over the Transaction, but it also reveals other facts that demonstrate that BAT did not and could not control the RAI Board or cause it to lose its independence: the extraordinary limitations that the Governance Agreement imposes on BAT's ability to dominate the RAI Board.

{56}    The Delaware Supreme Court emphasized actual, rather than theoretical, control as the underlying basis of a fiduciary duty owed to a minority shareholder when it pronounced that "a shareholder owes a fiduciary duty only if it owns a majority interest in or *exercises control* over the business affairs of the corporation." *Kahn v. Lynch Commc'n Sys.*, 638 A.2d 1110, 1113–14 (Del. 1994) (quoting *Ivanhoe Partners v. Newmont Mining Corp.*, 535 A.2d 1334, 1344 (Del. 1987) (emphasis in original)). Delaware courts impose a significant pleading burden to allow a fiduciary duty claim to proceed against a minority shareholder and will dismiss such a claim under Delaware's Rule 12(b)(6) in the absence of sufficient allegations. *See Dubroff v. Wren Holdings, LLC*, 2009 Del. Ch. LEXIS 89, at * 12 (May 22, 2009) (dismissing action because of a failure to adequately allege that the defendants formed a control group). Delaware courts presume that a shareholder who owns less than fifty percent of the outstanding stock of a corporation is not a controlling shareholder. *In re Zhongpin Stockholders Litig.*, 2014 Del. Ch. LEXIS 252, at *18 (Nov. 26, 2014), *rev'd on other grounds sub nom.*, *In re Cornerstone Therapeutics, Inc.*, 2015 Del. LEXIS 231 (Del. May 4, 2015); *cf. ALI Principles of Corporate Governance* § 1.10 (b) (2014) (applying a rebuttable presumption of control for shareholders with greater than twenty-five percent ownership of a corporation). Rebutting the presumption requires evidence that the minority owner had "actual control of corporate conduct." *Citron v. Fairchild Camera & Instrument Corp.*, 569 A.2d 53, 70 (Del. 1989).

{57} Delaware courts have not expressed a test that turns on a single indicator of control but instead look to various factors in addition to the percentage of ownership. *See In re Zhongpin*, 2014 Del. Ch. LEXIS 252, at \*24–26 ("[T]he Court does not take an unduly restrictive view of the avenues through which a controller obtains corporate influence."). But, again, the important factor is "actual exercise" of control, so that a claim cannot move forward solely on allegations of the potential for exercise of control by the minority shareholder. *Weinstein Enters. v. Orloff*, 870 A.2d 499, 507 (Del. 2005). In *Williamson v. Cox Communications, Inc.*, 2006 Del. Ch. LEXIS 111 (June 5, 2006), the Delaware Chancery Court listed various factors that a court may analyze when evaluating whether a shareholder exercised such actual control over a transaction, including whether the shareholder has appointed affiliates to the board of directors, *id.* at \*16, and whether the shareholder has veto power over certain transactions, *id.* at \*20–21. The *Williamson* court required the plaintiff to plead a "nexus of facts" in order to raise an inference of control. *Id.* at \*24.

{58} At least for larger corporations governed by a board of directors, Delaware courts focus their inquiry on whether a shareholder exercised actual control of the board of directors, because the corporate decision-making processes of a corporation are controlled by the board. *See Superior Vision Servs. v. ReliaStar Life Ins. Co.*, 2006 Del. Ch. LEXIS 160, at \*16 n.38 (Apr. 25, 2006); *see also In re KKR Fin. Holdings LLC S'holder Litig.*, 101 A.3d 980, 993 (Del. Ch. 2014). Even if a shareholder may be given atypical powers by contract, a challenge to a transaction may fail if there are not adequate facts from which to conclude that the board was not able to "freely exercise[] its independent judgment." *Id.* at 995; *Superior Vision*, 2006 Del. Ch. LEXIS 160, at \*15–20 ("[A] significant shareholder, who exercises a duly-obtained contractual right that somehow limits or restricts the actions that a corporation otherwise would take, does not become, without more, a 'controlling shareholder' for that particular purpose.").

{59} The following statement is a fair distillation of how the policies the Delaware courts have emphasized merge into the pleading standard:

When a stockholder owns less than 50% of the corporation's outstanding stock, a plaintiff must allege domination by a minority shareholder through actual control of corporate conduct. The bare conclusory allegation that a minority stockholder possessed control is insufficient. Rather, the Complaint must contain well-pled facts showing that the minority stockholder exercised actual domination and control over . . . [the] directors. That is, under our law, a minority blockholder is not considered to be a controlling stockholder unless it exercises such formidable voting and managerial power that [it], as a practical matter, [is] no differently situated than if [it] had majority voting control. Accordingly, the minority blockholder's power must be so potent that independent directors . . . cannot freely exercise their judgment, fearing retribution from the controlling minority blockholder.

*In re Morton's Rest. Grp., Inc.*, 74 A.3d 656, 664–65 (Del. Ch. 2013) (alterations in original) (internal quotation marks omitted) (internal citations omitted).

{60}    As noted above, the North Carolina courts have not specifically addressed the significance of the percentage of ownership held by the shareholder against whom a breach of fiduciary duty claim is presented. As such, North Carolina courts have not expressly articulated a presumption that a minority shareholder does not have control. But, Delaware's requirement that a claimant demonstrate actual control is consistent with the North Carolina Supreme Court's discussion in *Gaines*, which relates the power of a single, controlling shareholder to that of a controlling board of directors. 234 N.C. at 345, 67 S.E.2d at 353–54. This Court is comfortable that, should our appellate courts elect not to impose the rigid requirement of majority ownership that BAT promotes, they would, at a minimum, impose a strong presumption that a minority shareholder owes no fiduciary duty absent detailed facts evidencing actual control equivalent to majority ownership.

{61}    The Amended Complaint presents facts, construed favorably to Corwin, that demonstrate that the RAI Board's desire to continue its relationship with BAT may have strongly influenced its actions, and that, to continue the relationship, it may have had to accommodate certain of BAT's contractual rights, including the potential veto over at least some aspects ultimately included in the Transaction's terms. But the Amended Complaint also acknowledges, as it must,

the terms of the Governance Agreement and the two separate votes of the RAI Board of Directors and of the Other Directors, who were insulated from BAT's control and who remained free to exercise independent judgment without fear of BAT's reprisal.

{62} The Court acknowledges that Corwin pleads facts with significant detail. In summary, he alleges

- BAT owns forty-two percent of RAI's outstanding shares, in comparison to the next largest ownership block of five percent, such that, as RAI admitted in its SEC filings, "[u]nless substantially all RAI shareholders other than BAT vote together on matters presented to RAI shareholders, BAT would have the power to determine the outcome of matters submitted to a shareholder vote, which could result in RAI taking actions that RAI's other shareholders do not support." (First Am. Class Action Compl. ¶ 35 (quoting Director Defs.' & RAI's Br. Supp. Mot. Dismiss Pl.'s First Am. Class Action Compl. Ex. A ("Prelim. Proxy"), at 65).)[7]

- The Governance Agreement gave BAT veto power over the sale of certain intellectual property necessary to complete the Transaction.

- BAT had the contractual right to appoint five of RAI's thirteen directors; two of the other eight directors had close ties with BAT; and BAT's designees made presentations to the RAI Board on behalf of BAT.

- RAI admitted that two of its objectives for the Transaction were to maintain BAT as a significant beneficial owner and for BAT to continue to participate in ownership and leadership of RAI after the Transaction.

- RAI and BAT executed a non-binding term sheet on June 14, 2013, after approval of the term sheet by the Other Directors. This was several months before the Other Directors secured separate counsel, and they never retained an independent financial advisor or received a separate fairness opinion regarding the BAT share purchase.

- The Transaction occurred close in time to the expiration of the contractual prohibition on BAT's acquisition of additional shares of RAI or acquisition of RAI outright.

---

[7] In his brief opposing the Motions, Corwin indicates that this factor would be particularly significant if the shareholders were asked to vote without the benefit of adequate disclosures. However, Corwin entered into a class settlement premised on the concept that the additional disclosures allowed the shareholders to cast a fully informed vote. RAI shareholders approved the Transaction with access to the newly disclosed information.

- RAI met with BAT to test its support for any transaction before making a proposal to Lorillard or Imperial, and BAT conditioned its cooperation with the Transaction on transactional terms and an execution strategy of which it approved.

- Thereafter, BAT and RAI jointly negotiated with a potential divestment partner, and BAT was allowed to make direct presentations to the RAI Board.

- In addition to its contractual rights, BAT enjoyed leverage as a major financing source for the Transaction.

- BAT was able to purchase shares, maintaining its 42 percent stake, at the lowest trading price in the weeks before the Transaction was announced, reflecting what Corwin contends was a 4.8 percent discount to the share value as of July 14, 2014, the date used to calculate the value paid to Lorillard shareholders. This price was also significantly below the post-Transaction price, and BAT was not required to pay separate consideration to RAI's other shareholders, whose interests the Transaction diluted.

- It appears that RAI never considered other options to finance the Transaction besides BAT equity financing.

- The BAT Designees spoke on behalf of BAT while sitting on the RAI Board of Directors. This was contrary to their duty as RAI Board members, who only owe a fiduciary duty to the company on whose board they sit: RAI.

- BAT retained the right to veto a change in the Transaction's terms in its sole discretion.

{63}   BAT stresses that these facts, even if the Court accepts them as true, are not adequate to establish BAT's dominance and control, which is necessary to impose a fiduciary duty on it as a minority shareholder.

{64}   The Court agrees with BAT's assessment that the limitations on board control that the Governance Agreement imposes are extraordinary and that the particularized facts of the Amended Complaint do not rise to a level adequate to justify the imposition of a fiduciary duty on BAT. Influence does not equate to control, and the potential imposition of a fiduciary duty turns on evidence of actual control.

{65}    The Court then concludes that the Amended Complaint fails to state a claim that BAT controlled the Transaction.  While not bound to follow Delaware precedent, the Court concludes that the Amended Complaint would not survive should the Delaware standard control, because the allegations, taken as true, do not adequately allege that BAT's control over the Transaction was considerable enough to be the voting and managerial equivalent of a majority shareholder's control, *see In re Morton's Rest. Grp., Inc.*, 74 A.3d at 664–65 (noting the Delaware standard), or so potent that the independent Other Directors were unable to exercise their judgment freely with fearing BAT's retribution, *id.* at 665.[8]  As noted below, the Amended Complaint further demonstrates that the RAI Board was well-informed when voting to approve the Transaction.

## D. The Amended Complaint Does Not Allege Sufficient Facts to Demonstrate that Director Defendants Breached Their Fiduciary Duties

### a. Corwin's Standing

{66}    The Director Defendants urge that the Court should not even consider the breach of fiduciary claim asserted against them because Corwin has no standing to bring such a claim.  Standing for a minority shareholder to bring direct claims against a controlling shareholder has been clearly recognized in North Carolina. *See, e.g.*, *Fulton*, 255 N.C. at 185, 120 S.E.2d at 411–12; *Norman v. Nash Johnson & Sons' Farms, Inc.*, 140 N.C. App. 390, 407, 537 S.E.2d 248, 260 (2000); *Miller v. Ruth's of N.C., Inc.*, 68 N.C. App. 40, 43, 313 S.E.2d 849, 851 (1984).  It is not clear that the policy reasons underlying this recognition of standing to bring a direct claim against the controlling shareholder would extend to allowing a direct claim against directors who approved a transaction with the controlling shareholder.  It is even less certain that there is any policy reason in the setting of a publicly traded

---

[8] In his Amended Complaint, Corwin makes various allegations that the Director Defendants and financial advisors were not independent because of some connection with BAT.  The Court believes the alleged personal interests or conflicts are too vaguely alleged or too remote, even if accepted to be true, for the Court to conclude that the Director Defendants did not act independently and were dominated by BAT.

corporation that would justify allowing a direct action for a claim that would otherwise be properly brought as a derivative action.

{67}     Typically, a shareholder does not have standing to bring a direct action against third parties, including members of a board of directors, to recover for any wrong committed against the corporation. *Barger v. McCoy Hillard & Parks*, 346 N.C. 650, 658, 488 S.E.2d 215, 219 (1997). Such claims must be brought derivatively. An exception exists where the shareholder adequately alleges either (1) a special duty between the third party wrongdoer and the shareholder, or (2) that the injury suffered by the shareholder was "separate and distinct" from the injury suffered by other shareholders. *Id.* (quoting 12B *Fletcher Cyclopedia of the Law of Private Corporations* § 5911, at 484 (perm. ed. 1993)); *see also Thomas*, 2015 NCBC LEXIS 67, at *21. The injury is sufficiently separate and distinct if it is "peculiar or personal" to the shareholder alleging injury. *Howell v. Fisher*, 49 N.C. App. 488, 492, 272 S.E.2d 19, 23 (1980) (quoting *Snyder v. Freeman*, 300 N.C. 204, 217, 266 S.E.2d 593, 601 (1980)).

{68}     As a general proposition, an injury predicated on the diminution of value of a plaintiff's shares is not a separate and distinct injury from the injury the corporation itself suffered, *id.* at 492, 272 S.E.2d at 22, as the loss of corporate value reflected by the decline in share price affects all shareholders equally, *Barger*, 346 N.C. at 659, 488 S.E.2d at 220 (noting that a loss in value of a shareholders shares is exactly the same injury suffered by the corporation and other shareholders); Russell M. Robinson, II, *Robinson on North Carolina Corporation Law* § 17.02[1], at 17-3 (7th ed. 2014) ("North Carolina courts have expressly rejected the argument that a shareholder has an individual right to recover directly for any loss in the value of his shares caused by a wrong committed against the corporation.").

{69}     Corwin's claim here, however, differs from than those previously considered by the North Carolina courts. He claims that RAI did not receive adequate value for BAT's share purchase and that the loss was not shared equally by all shareholders. Rather, he claims, the class of public shareholders other than BAT suffered a special injury when BAT caused RAI to enter into the Transaction.

{70}　　Corwin again turns to Delaware precedent to argue for his standing. Delaware courts have recognized that public shareholders may bring a direct claim against a majority or controlling shareholder when shares representing both voting and economic power are improperly issued to the majority or controlling shareholder. *Gentile v. Rossette*, 906 A.2d 91, 99–100 (Del. 2006); *see also Gatz v. Ponosolt*, 925 A.2d 1265, 1277–79 (Del. 2007) (summarizing the doctrine underlying *Gentile*). Even assuming that Delaware would allow such standing against anyone other than a controlling shareholder, it is also uncertain whether any North Carolina appellate court would follow Delaware's lead even in the narrow circumstance of a controlling shareholder, because the Delaware Supreme Court has expressly rejected *Barger*'s "special injury" test. *See Tooley v. Donaldson, Lufkin, & Jenrette, Inc.*, 845 A.2d 1031, 1035–36 (Del. 2004). When invited to similarly reject the special injury test clearly established by *Barger*, the North Carolina Court of Appeals flatly refused to follow Delaware's lead. *Estate of Browne v. Thompson*, 219 N.C. App. 637, 639–40, 727 S.E.2d 573, 575–76 (2012) (refusing to reject the "special injury" test pursuant to *Tooley* in favor of the *Barger* test).

{71}　　Because of the uncertainty of whether Corwin's claim that the Transaction had a disparate impact on different shareholders would survive under *Barger*, the Court elects to assume his standing to bring a direct claim without deciding the issue. If it becomes later necessary to consider the issue, and if the claim is found to be derivative instead of direct, Corwin's claims would fail for lack of standing. However, the Court has not reached that issue because it determines that Corwin's claim against the Director Defendants fails on its merits.

b.　<u>The Asserted Breach by the Director Defendants</u>

{72}　　Corwin argues that the burden of proof has shifted to the Director Defendants to prove that the Transaction was fair, but does so in the context of his assertion that BAT is a controlling shareholder. His argument is that the

> Director Defendants' conduct is subject to a heightened standard of review, not because they are selling the Company but because they are engaging in a transaction with a controlling shareholder. Thus, the Director Defendants are properly subject to the common-law rule that places the burden on them to demonstrate the fairness of a conflicted transaction with the Company's controlling shareholder.

(Pl.'s Omnibus Opp'n Defs.' Mots. Dismiss 29 (citing *Erwin Mills*, 239 N.C. at 444, 80 S.E.2d at 363).) Defendants respond that any enhanced standard is improper irrespective of whether BAT is a controlling shareholder, because the North Carolina legislature rejected an enhanced standard when it enacted section 55-8-30, which codifies a general standard for directors of a corporation applicable to all transactions. *See* N.C. Gen. Stat. § 55-8-30 (2014); Robinson, *supra* § 14.06, at 14-18 to -19 (noting the various standards available under Delaware law, and noting that, in North Carolina, "[a] 1993 amendment to the Business Corporation Act rejected the application of those separately higher standards as such").

{73}     North Carolina's Business Corporation Act adopted standards for completing transactions with interested directors. *See* N.C. Gen. Stat. § 55-8-31. Arguably, a transaction with a controlling shareholder who is not also a director might require a court to revert to the prior common law rule, because the Act does not include specific standards for transactions with a controlling shareholder. *See id.* However, having concluded that the Transaction did not involve a controlling shareholder, the Court need not further consider such a possibility.[9] The Court concludes that the Director Defendants are to be judged by the general standards delineated by section 55-8-30, which requires a director to "discharge his duties as a director . . . : (1) In good faith; (2) With the care an ordinarily prudent person in a like position would exercise under similar circumstances; and (3) In a manner he reasonably believes to be in the best interests of the corporation." N.C. Gen. Stat. § 55-8-30(a). "A director is not liable for any action taken as a director, or any failure

---

[9] Should such consideration become necessary, it might further extend to the question of whether an attack on such a transaction is foreclosed when it is ratified by a majority vote of fully informed shareholders, in the same manner as a transaction with an interested director. *See* N.C. Gen. Stat. 55-8-31(d).

to take any action, if he performed the duties of his office in compliance with [section 55-8-30]." *Id.* § 55-8-30(d).

{74} The Director Defendants urge that the Amended Complaint, viewed along with the documents it incorporates, contains no allegation that the Director Defendants were incompetent, and demonstrates clearly that they were well informed of the Transaction's material terms, which is all that is statutorily required of them. *See* N.C. Gen. Stat. 55-8-31(a)(1).

{75} Corwin's arguments include the suggestion that the Director Defendants failed to adequately inform themselves prior to separately voting on the Transaction by failing to obtain an independent financial advisor to opine on the fairness of the BAT share purchase. The Director Defendants counter by reference to the actions the Other Directors took in order to become and remain informed, including meeting "several times to discuss the deal, [and] receiving legal and financial advice from Lazard, Jones Day, Moore & Van Allen, and Richards Layton." (The Director Defs.' And Reynolds American, Inc.'s Reply Br. Supp. Mot. Dismiss Pl.'s First Am. Class Action Compl. 9 (citing Prelim. Proxy 86–109).) They claim that having taken such actions, they are insulated from liability by application of the business judgment rule. [10] In light of these additional efforts, the Court does not believe the Other Directors' failure to secure a separate, independent financial advisor is sufficient to demonstrate that they violated their statutory duty of care.

{76} The statutory standard reflects the same considerations underlying the business judgment rule which has been long applied in North Carolina. The business judgment rule provides a substantive presumption that a director acted with due care, so that the director's judgment will not be judicially second-guessed unless it was not supported by a rational business purpose. *Winters v. First Union Corp.*, 2001 NCBC LEXIS 5, at *8–11 (N.C. Super. Ct. July 12, 2001). The business

---

[10] Effectively, consideration of the traditional business judgment rule as it has been applied in North Carolina merges into consideration of whether directors have satisfied the statutory standard defined by section 55-8-30. *See* Robinson, *supra* § 14.06, at 14-17 n.2 (discussing Official Comment that the Model Corporations Act did not intend necessarily to codify the common law business judgment rule).

judgment rule's presumption that a director exercised due care may be rebutted if a plaintiff seeking judicial review of board action alleges specific facts that indicate "that the board was inattentive or uninformed, acted in bad faith, or that the board's decision was unreasonable." *Wachovia Capital Partners v. Frank Harvey Inv. Family L.P.*, 2007 NCBC LEXIS 7, at *12 (N.C. Super. Ct. Mar. 5, 2007); *see also* Robinson, *supra* § 14.06, at 14-17 to -18.  In assessing the impact of the business judgment rule on Corwin's claims, the Court must accept his factual allegations but it is not bound by his legal conclusions.  *Walker*, 137 N.C. App. at 392, 529 S.E.2d at 241.  The Court concludes that the Amended Complaint shows neither that the Board was uninformed nor that its decision was not attributable to a rational business purpose.  Rather, the facts, taken in combination, are adequate to demonstrate that the Board's decision was sufficiently independent, informed, and rational to preclude second-guessing in a judicial forum.  Such a review is exactly what the business judgment rule is intended to foreclose.

{77}    The Court is mindful that Corwin attempts to argue that one or more of the Other Directors had some direct or indirect interest adequate to classify that director as "interested" within the meaning of section 55-8-31(a).  N.C. Gen. Stat. § 55-8-31(a) (discussing the impact of a conflict-of-interest transaction).  Even assuming, contrary to the Court's own opinion based on the facts alleged, that Corwin has a factual basis for his assertion, Corwin has certainly failed to plead adequate facts to conclude that a *majority* of the Other Directors were conflicted.  A conflict by one director would not require the Court to set the Transaction aside, considering its approval by a majority of the Other Directors.[11].  *See id.* § 55-8-31(c).

{78}    In sum, as to the breach of fiduciary duty claim against the Director Defendants, the Court assumes Corwin's standing to bring a direct claim, but concludes that

---

[11] Again, should the claim be allowed to survive the initial Motions, Corwin would then be confronted by a potential defense that the Transaction was ratified by the vote of an informed shareholder majority.  *See* N.C. Gen. Stat. § 55-8-31(d).

- there is no claim of breach of fiduciary duty for approving a transaction with a controlling shareholder because Corwin has not alleged facts that allow for a determination that BAT controlled the Board with regard to the Transaction, and there is no other basis for finding a fiduciary duty existed;

- Corwin has not alleged facts, even if accepted as true, adequate to rebut the presumption that the Director Defendants acted in accord with their statutory duty of care, or that they did not approve the Transaction for a rational business purpose after being adequately informed as to the material facts of the Transaction; and

- Corwin has not alleged facts, even if accepted as true, sufficient for the Court to set aside the Transaction because of a director conflict, particularly considering that the Transaction was approved by a majority of directors for whom there is little to no basis on which to ascribe a direct or indirect conflict.

### E. The Court Need Not Further Consider Corwin's Claim that RAI Aided and Abetted the Breach of Fiduciary Duty of Its Own Directors

{79} Corwin claims that "[RAI], including without limitation through the actions of its Board of Directors, aided and abetted the Director Defendants' breaches of fiduciary duties, and was an active and knowing participant in the breaches of fiduciary duties owed to Plaintiff and the members of the Class by the Director Defendants." (First Am. Class Action Compl. ¶ 138.)

{80} North Carolina Courts, including this one, have recognized the uncertain existence of a claim of aiding and abetting breach of fiduciary duty. *See, e.g., Bottom v. Bailey*, __ N.C. App. __, 767 S.E.2d 883, 889 (2014) (expressing doubt that North Carolina recognizes a claim for aiding and abetting breach of fiduciary duty, but affirming the trial court's dismissal of that claim on other grounds); *Land v. Land*, No. COA11-1027, 2012 N.C. App. LEXIS 893, at *20–21 (Aug. 7, 2012) (noting that whether aiding and abetting breach of fiduciary duty is recognized is "unclear"); *Ehrenhaus v. Baker*, 216 N.C. App. 59, 88–89, 717 S.E.2d 9, 29 (2011)

(same); *Veer Right Mgmt. Grp. Inc. v. Czarnowski Display Serv., Inc.*, 2015 NCBC LEXIS 13, at *6 (N.C. Super. Ct. Feb. 4, 2015) ("Whether North Carolina recognizes a claim for aiding and abetting a breach of fiduciary duty remains an open question."); *Tong v. Dunn*, 2012 NCBC LEXIS 16, at *11–20 (N.C. Super. Ct. Mar. 19, 2012), *rev'd on other grounds*, 752 S.E.2d 669 (N.C. Ct. App. 2013). The claim is even more uncertain where a corporation is alleged to have aided and abetted the breach of duty by its own directors.

{81} The Court need not consider the question further, however, as it has found that the Amended Complaint fails to allege an underlying breach of fiduciary duty by RAI's directors. *See Veer Right*, 2015 NCBC LEXIS 13, at *8 ("[T]he elements [of an aiding and abetting breach of fiduciary duty claim] would include . . . [a] violation of a fiduciary duty by the primary party . . . .").

## VI.  CONCLUSION

{82} For the foregoing reasons, the Motions are GRANTED, and Corwin's Amended Complaint is DISMISSED. The parties are directed to proceed with appropriate efforts to finalize the Court's consideration of the settlement of Corwin's Disclosure Claims. Corwin is requested to file the appropriate motion for approval of the settlement on or before August 29, 2015.

IT IS SO ORDERED, this the 4th day of August, 2015.

/s/ James L. Gale
_____
James L. Gale
Chief Special Superior Court Judge
   for Complex Business Cases